UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BARRY WILLIS,<br><br>    Defendant. | Case No. 24-20187<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS [27]**

After being advised that Barry Willis was engaged in drug dealing, local law enforcement officers executed search warrants at three properties with a demonstrable connection to Willis. The searches uncovered evidence of a large-scale drug operation, including over 40 kilograms of fentanyl, drug paraphernalia, significant sums of money, and firearms. Willis was subsequently indicted on federal drug and gun charges. Willis says the government should not be able to use the seized evidence against him at trial because the affidavit in support of the search warrant lacked probable cause. The government disagrees. So does the Court. Accordingly, Willis' motion to suppress is DENIED.

**I.**

In providing the factual background, both parties rely on the search warrant affidavit prepared by officer Sam Tamer of the Livonia Police Department (ECF No. 29-2). So the Court will do the same.

In late September of 2023, Tamer received information from a cooperating individual ("CI") that a man referred to as "Blue" was involved in the sale and distribution of heroin. (*Id.* at PageID.193.) The CI shared a description of and cell phone number for "Blue." (*Id.*) The CI also advised that "Blue" owned a gas station with an adjoining car wash in the City of Detroit, on the east side of Livernois just north of Davison. (*Id.*) Using Google maps, Tamer identified a Citgo gas station with an adjoining car wash in the reported vicinity. (*Id.* at PageID.193–194.) Additional searches of business and tax databases revealed the business was associated with Barry Willis, who had a home address of 42105 Dorchester Court in Clinton Township. (*Id.* at PageID.194.) This information enabled Tamer to obtain a Michigan driver's license photo of Willis from the Michigan Secretary of State computer system. (*Id.*) Tamer showed the photo to the CI, who identified Willis as "Blue," the man the CI purchased heroin from on multiple occasions. (*Id.*)

In February and March 2024, at Tamer's direction, the CI conducted two controlled purchases of heroin from Willis. (*Id.*) The first transaction took place on February 27, 2024, at the meeting place arranged by the CI and Willis. (*Id.*; ECF No. 27, PageID.148.) Upon arrival, the CI exited his/her car and entered Willis' green Jeep Gladiator, where the parties exchanged the drugs for money. (*Id.*) Immediately after the transaction, members of the Livonia Police Intelligence Bureau followed Willis' Jeep to a residence at 20203 Littlefield in Detroit. (*Id.*) Meanwhile, the CI provided Tamer with the suspected heroin purchased from Willis. (*Id.* at PageID.195.)

2

No other contraband was discovered on the CI or in the CI's vehicle. (*Id.*) The drugs purchased from Willis tested positive for fentanyl. (*Id.*)

Prior to the second controlled buy, Livonia police officers conducted surveillance of the green Jeep Gladiator and the Dorchester Court residence. (*Id.*) On one occasion in February, the Jeep Gladiator was observed driving from the Citgo gas station to a Savvy Sliders restaurant owned by Willis' wife. (*Id.*) On another occasion in March, officers observed Willis exit the Savvy Sliders, load boxes into the Jeep Gladiator, and take them to the Citgo station. (*Id.*) After unloading the boxes, Willis drove to the residence at 20203 Littlefield. (*Id.*) Later that month, officers observed Willis' wife's Chevy Tahoe parked in the driveway of the Dorchester Court residence and the name "Willis" on the mailbox. (*Id.*)

The second controlled buy between Willis and the CI took place on March 25, 2024. (*Id.*; ECF No. 27, PageID.149.) Again, Tamer searched the CI's person and vehicle for drugs prior to the buy and found nothing. (*Id.*) Also prior to the transaction, Livonia officers established surveillance at the Littlefield residence and observed Willis' second car—a gray Jeep Grand Cherokee—in the driveway. (*Id.*) The officers saw Willis exit the Littlefield residence, get into the Jeep, and drive away. (*Id.* at PageID.196.) The officers followed Willis and watched as he drove up to another vehicle and engaged in a hand-to-hand transaction with the driver, consistent with a narcotics transaction. (*Id.*) Willis then proceeded directly to the meeting location with the CI and exchanged the suspected heroin for money. (*Id.*)

Like before, the CI provided the drugs to Tamer and the drugs tested positive for fentanyl. (*Id.*)

Livonia police officers again tailed Willis after this controlled buy. (*Id.*) They followed Willis to the Citgo station, where he stopped briefly, and then to a second location, where he met with a man in a Lincoln SUV for less than a minute. (*Id.*). Based on Tamer's training and experience, he thought this brief encounter was consistent with a narcotics transaction. (*Id.*) Willis then went straight back to the Citgo station and again went inside only briefly before leaving. (*Id.*) He then stopped at the Littlefield residence, went inside, and left seconds later. (*Id.* at PageID.197.) The officers followed Willis to an area where he met with two females. (*Id.*) The females entered Willis' Jeep and exited seconds later, which was also consistent with a narcotics transaction. (*Id.*) Willis drove away and went straight back to the Littlefield residence, using a key to enter the side door. (*Id.*)

Additional surveillance was established on the Dorchester Court residence. (*Id.*) In late March, Livonia police observed Willis' gray Jeep Grand Cherokee and his wife's Chevy Tahoe parked in the driveway. (*Id.*) Willis was observed loading a case of water into the Jeep and driving to the Littlefield residence. (*Id.*) Willis let himself into the residence and left a short time later. (*Id.*) He then drove to the area of St. Martins and Washburn in Detroit, where he met a black male in a Lincoln SUV. (*Id.*) The driver of the Lincoln exited his vehicle and walked to the front passenger door of Willis' Jeep. (*Id.*) Seconds later, the man returned to the Lincoln. (*Id.*) This brief encounter, believed Tamer, was consistent with a drug transaction. (*Id.*) Willis drove

4

away and went directly to the Citgo station. (*Id.*) One of the surveilling officers followed Willis into the Citgo station and saw Willis inside a walk-in vault-style safe behind the counter. (*Id.*) The surveillance of Willis was terminated a short time later. (*Id.*)

## II.

After reviewing Tamer's affidavit reciting the facts above, a Michigan state judge authorized a warrant to search the Dorchester Court residence, Littlefield residence, and Citgo gas station for, among other things, fentanyl and other controlled substances, drug paraphernalia, documentary and electronic evidence, drug proceeds, and firearms. (*Id.* at PageID.189–190, 199.) Upon execution of the warrants, that is precisely what law enforcement found: (1) at Willis' Dorchester Court home, officers recovered approximately $134K in cash, 10 watches, a Glock handgun, and, in Willis' Jeep, a key to one of the doors of the Littlefield residence; (2) at the Littlefield residence, officers found over 2.6 kilograms of cocaine, over 41 kilograms of fentanyl in both powder and pill form, a money counter, multiple pill and narcotic presses, narcotics packaging materials, narcotics scales, two handguns, and $18K, which included $400 in pre-recorded buy funds; and (3) at the Citgo station, officers seized $3K and a Smith and Wesson revolver. (ECF No. 29-3.)

Based on those discoveries, Willis was arrested and initially charged in a federal criminal complaint with distribution of controlled substances and possession with intent to distribute controlled substances. (ECF No. 1.) One week later, Willis was indicted on one count of possession of fentanyl with intent to distribute, one count

5

of possession of a firearm in furtherance of a drug-trafficking crime, and one count of being a felon in possession of a firearm. (ECF No. 11.)

Willis has now moved to suppress the evidence resulting from the searches of the three properties. (ECF No. 27.) He also requests a *Franks* hearing before the Court rules on the motion. (*Id.*) The government opposes the motion. (ECF No. 29.) Willis has not cleared the high bar for a *Franks* hearing and the motion can be decided on the thorough briefing. *See* E.D. Mich. LR 7.1(f).

### III.

Federal constitutional law applies to state warrants challenged in federal court. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). The Fourth Amendment mandates that warrants be issued only upon probable cause. U.S. Const. amend. IV. The Sixth Circuit has "long held that a probable-cause nexus must connect" the intended "place to be searched and the things to be seized." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021) (cleaned up); *see also United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) ("There must . . . be a 'nexus between the place to be searched and the evidence sought.'" (citation omitted)). In other words, "[t]here must be a fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *Reed*, 993 F.3d at 447; *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (explaining that probable cause exists for a search warrant when "there is a fair probability that contraband or evidence of a crime will be found in a particular place"). Probable cause is not a "high bar to clear." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir.

2019) (en banc) (citation omitted). This Court must afford "great deference" when considering the issuing judge's probable cause determination. *Id.* at 311–12.

### A.

With respect to the Littlefield and Citgo properties, the search warrant affidavit here passes the low probable cause bar. The two controlled drug buys corroborated the CI's tip that Willis was trafficking drugs. *See United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) ("[A]n affidavit that both details an informant's tip and describes a controlled drug purchase with the informant provides 'sufficient corroborating information' to uphold a finding of probable cause."). As the en banc Sixth Circuit recently found:

> An informant who seemingly was known to the officers— . . . [because] the informant met with the officers in person and promptly engaged in two controlled buys—was immediately proven right twice over through those transactions. All of this suggests the informant's initial tip was quite credible. And a sufficiently reliable tip can help establish probable cause.

*United States v. Sanders*, 106 F.4th 455, 464 (6th Cir. 2024).

Here, the controlled buys, as well as additional surveillance of Willis, clearly linked him to the Citgo and Littlefield properties. On February 27, 2024, after the first controlled buy with the CI, Willis drove directly back to the Littlefield property. And on March 25, 2024, Willis traveled from the Littlefield residence to the second controlled buy, making only one stop along the way to engage in what appeared to be, per officer Tamer's training and experience, another drug transaction. Immediately after selling the drugs to the CI, Willis drove directly to the Citgo station. Willis did not stay long before leaving and engaging with an occupant of another vehicle in what

7

was also consistent with a drug transaction. From there, he returned to the Citgo station and then, a short time later, traveled to the Littlefield residence. But seconds after entering the Littlefield residence he left and met briefly in his car with two women in an interaction that also had hallmarks of a drug transaction. He then returned directly to the Littlefield residence.

"Probable cause exists to search a residence if an affidavit directly connects the residence with the suspected drug dealing activity." *United States v. Sheckles*, 996 F.3d 330, 341 (6th Cir. 2021) (citation omitted). The quantum of proof necessary to establish the requisite connection is not entirely clear. But the Sixth Circuit has repeatedly upheld a probable-cause finding when "police watched the suspect leave a home, undertake a drug deal, and return there." *Reed*, 993 F.3d at 448 (6th Cir. 2021) (citations omitted); *see also United States v. Miller*, 850 F. App'x 370, 371 (6th Cir. 2021) ("[W]e have repeatedly held that probable cause exists to search a residence for drug-related evidence when a drug dealer travels directly from that residence to the site of a drug deal."); *United States v. Ward*, No. 22-1233, 2023 U.S. App. LEXIS 2059, at *7 (6th Cir. Jan. 24, 2023) ("[W]e have found a sufficient nexus where the affidavit established that the defendant traveled directly from the residence to be searched to the site of the drug sale."); *Sanders*, 106 F.4th at 463 (reiterating that traveling to and from locations while engaged in controlled buys of narcotics supports an inference that drugs, drug proceeds, and/or other evidence of drug trafficking will be found at those locations).

8

The facts of this case fit that profile. Considering the totality of the circumstances—as the Court must when reviewing an affidavit, *see Gates*, 462 U.S. at 238—officer Tamer established a sufficient nexus between the Littlefield and Citgo properties and the evidence of drug trafficking activity he sought.

### B.

Willis' Dorchester Court residence presents a closer call. Remember that "[p]robable cause is . . . location-specific: There must be a sufficient 'nexus between the place to be searched and the evidence sought' for probable cause to exist at a particular site." *United States v. Ortiz*, No. 22-3919, 2024 U.S. App. LEXIS 14914, at *6 (6th Cir. June 18, 2024) (quoting *Carpenter*, 360 F.3d at 594). "Historically," Sixth Circuit "cases have blessed the inference that 'in the case of drug dealers, evidence is likely to be found where the dealers live.'" *Sanders*, 106 F.4th at 465 (quoting *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991)) (collecting cases). "Yet this inference does not always carry the day." *United States v. Neal*, 106 F.4th 568, 573 (6th Cir. 2024). The Court has, instead, "cabined cases in which the so-called known drug dealer inference can establish probable cause to those in which the dealer is engaged in continual and ongoing operations typically involving large amounts of drugs." *Id.* (internal quotation marks omitted) (quoting *Sheckles*, 996 F.3d at 342); *see also United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2013) ("We have never held, however, that a suspect's 'status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.' Rather, we have required some reliable evidence connecting the known drug dealer's ongoing criminal activity

9

to the residence." (citation omitted)). Further, "isolated drug dealing or stale evidence of drug dealing does not suffice to establish a fair probability that drug trafficking evidence will be found in the home of the suspect." *Neal*, 106 F.4th at 573 (citing *Sanders*, 106 F.4th at 466). Ultimately, "[t]he resolution of who is a 'known drug dealer' engaged in 'continual and ongoing operations' or what sufficient evidence of residency is, therefore, necessarily a 'fact-specific' inquiry." *Id*. (quoting *Sheckles*, 996 F.3d at 342); *see also Reed*, 993 F.3d at 451 ("[O]ur precedent leaves unclear the amount of drug activity required to invoke this nexus principle.").

Here, the search warrant affidavit does not contain sufficient facts showing that Willis' Dorchester Court residence had been used in drug trafficking. The CI did not tell the officers that he/she purchased heroin at Willis' residence or that Willis sold drugs out of his home. The affidavit does not state that any drug transactions were undertaken at or near the residence. This is true of the controlled buys and the other brief encounters that Willis had with people in their vehicles that appeared consistent with drug transactions. Likewise, Willis was never observed directly leaving from or returning to the Dorchester Court residence immediately before or after any of the observed drug transactions. Lastly, the quick hand-to-hand transactions described in the affidavit did not connect Willis to the type of "large, ongoing drug trafficking operation" involved in *Sheckles*. 996 F.3d at 342; *see also United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009) (holding that the "quantity of drugs [in the one to four kilogram range] and the repeated nature of the transactions" made it "reasonable to infer" that evidence of criminal activity would

be found in the defendant's residence). In sum, where, as here, "the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity . . . it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Brown*, 828 F.3d at 384.[1]

But that does not mean the officers did not rely on the search warrant affidavit in the good faith belief that it established probable cause. The exclusionary rule does not "bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984). There is no basis for labeling officer Tamer's affidavit as "bare-bones"—that is, "an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Sanders*, 106 F.4th at 468. Indeed, "[e]ven if an affidavit describing a suspect's drug activity does not establish a probable-cause nexus between the place to be searched and the evidence of that activity, the affidavit will avoid the bare-bones label so long as it identifies a 'minimally sufficient' nexus between the two." *Reed*, 993 F.3d at 450; *see also*

---

[1] The Court recognizes that this is a close call and a strong argument can be made the other way. Indeed, "[e]ven if no specific evidence ties drug dealing to a home, [the Sixth Circuit] ha[s] also called it 'well established' that a nexus to search the home can exist if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *United States v. Pointer*, No. 22-1082, 2022 U.S. App. LEXIS 35506, at *13 (6th Cir. Dec. 20, 2022) (quoting *Reed*, 993 F.3d at 448). "When an officer identifies 'recent reliable evidence of drug activity,' that activity can provide a 'reason to believe that drugs or other evidence of crime will be found in the suspect's' home beyond the suspect's status as a drug dealer alone." *Reed*, 993 F.3d at 448–49 (citations omitted). And within a two-month time frame of the controlled buys, officers observed Willis engage in what their training and experience led them to believe were several additional hand-to-hand drug transactions. Ultimately, however, the Court ends up in the same place due to the application of the good-faith exception.

11

*Carpenter*, 360 F.3d at 596 (explaining that good-faith reliance on an affidavit requires only a "minimally sufficient nexus" between the site of the search and the evidence sought). The Sixth Circuit has recognized that an affidavit provides this "minimally sufficient" nexus when it describes recent drug trafficking by the suspect, sets forth evidence of the suspect's residency, and explains the affiant's "experience with drug dealers keeping evidence of their dealing at their residences." *Neal*, 106 F.4th at 573–74; *see also Reed*, 993 F.3d at 451–52.

Once again, the facts of this case fit that profile. Tamer's affidavit detailed the investigation into Willis' drug dealing activities including information from the CI, successful controlled purchases from the CI, and several other hand-to-hand transactions observed by the officers in the weeks leading up to the warrant application. The affidavit also provided facts indicating that Willis lived at the Dorchester Court address and had a prior conviction for drug trafficking. Tamer further averred that he "knows from [his] specialized training and experience" that "[i]t is common for drug traffickers to conceal drug records, drug proceeds" and "books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage and transportation of controlled substances . . . within their residences." (ECF No. 29-2, PageID.191.) Thus, a finding of good-faith reliance is warranted. *See Reed*, 993 F.3d at 451; *United States v. Campbell*, No. 23-3736, 2024 U.S. App. LEXIS 27816, at *10–13 (6th Cir. Oct. 31, 2024).

In sum, Tamer's search warrant affidavit is not lacking in probable cause as to the Littlefield and Citgo properties and is not so lacking as to be deemed undeserving

of the protection of the good-faith exception as to the Dorchester Court residence. Thus, there is no basis to suppress the evidence seized from these locations.

## C.

Willis disagrees. He believes the warrant affidavit is deficient in numerous respects, including that it fails to establish a sufficient nexus between the properties to be searched and the presence of drug activity. His focus, though, is almost exclusively on the Littlefield residence. His arguments do not alter the Court's probable-cause conclusion.

### 1.

The essence of Willis' challenge is that "[t]here is no informant tip stating that drugs were sold out of the Littlefield property or that drugs were stored at the property." (ECF No. 27, PageID.158.) And, says Willis, "[t]he affidavit failed to establish direct or circumstantial evidence that Mr. Willis resided at the Littlefield property or that he owned the property." (*Id.*) Willis' arguments are misguided. The existence of a probable cause nexus between Willis' alleged drug dealing and the Littlefield residence does not require that drugs be sold out of the residence. As discussed, evidence that a drug dealer traveled to and from a location to engage in a drug deal can be enough. *See Miller*, 850 F. App'x at 373 (6th Cir. 2021) (explaining that "a fair probability that drugs were being stored in the residence or that drug trafficking was taking place from the residence" exists even "when the defendant traveled farther away from the residence to a drug deal"). And, as described in the

13

affidavit, personal surveillance of Willis enabled the officers to learn about, and connect Willis to, the Littlefield residence, whether he resided there or not.[2]

This is a good point for a brief digression to address the Sixth Circuit's recent en banc decision in *United States v. Sanders*, 106 F.4th 455 (6th Cir. 2024). (Notably, both parties rely on *Sanders*—Willis to distinguish it and the government to analogize to it.) There, a search warrant affidavit stated that a confidential informant advised law enforcement that Sanders was selling heroin from a particular apartment. *Id.* at 459. The affidavit further detailed that the officers arranged two controlled drug buys between the informant and Sanders, which took place in Sanders' vehicle, and that before and after these transactions Sanders was observed leaving from and then returning to the apartment. In rejecting Sanders' challenge to the warrant to search the apartment, the Sixth Circuit reiterated that "there is no model fact pattern for establishing a fair probability that contraband will be found at the place to be searched." *Id.* at 462. "Sometimes," explained the Court, "there is direct evidence, such as a credible informant's tip of criminal activity occurring in or directly outside of the location of the search." *Id.* (citation omitted). While "[o]ther times, circumstantial evidence will do the trick." *Id.* This can include, for instance, where "officers, after observing a person leave a location, soon find the individual

---

[2] The same is true for Willis' argument that the CI did not identify any of the locations at issue as belonging to Willis. (ECF No. 27, PageID.154.) The officers were able to make these connections on their own through information gathered from accessible databases and personal surveillance. And, "[a]t day's end, [the Court] assess[es] what the affidavit said about the informant's tip, not what it did not." *Sanders*, 106 F.4th at 464 (citation omitted).

14

possessing contraband, possibly even engaging in a sale involving the contraband, suggesting that the illicit materials came from the location." *Id.* (citation omitted). Or it can also "involve search warrants describing a controlled purchase of contraband followed by the defendant returning to the location sought to be searched, creating a reasonable inference that the defendant took the proceeds with him." *Id.* (citation omitted).

Applying *Sanders* here, the fact that Tamer's affidavit does not contain information about direct drug dealing out of the Littlefield residence does not preclude a finding of probable cause. To the contrary, "[e]vidence that one leaves a residence, engage[s] in a drug transaction, and then return[s] into the residence plainly demonstrate[s] a sufficient nexus with the location." *Id.* at 463 (internal quotation marks omitted).

### 2.

Willis also finds fault with the warrant affidavit because the CI did not indicate where Willis obtained the heroin he sold to the CI. (ECF No. 27, PageID.153.) But the identity of Willis' source of supply was not relevant to whether evidence of drug trafficking would be found at the Littlefield residence.

Willis seems to think it is. He makes the interesting argument (and confession) that his transaction with the individual in the SUV after he left the Littlefield residence on March 25, 2024, and just before he engaged in the controlled buy with the CI, involved him obtaining drugs from his supplier. Thus, insinuates Willis, since this is how he obtained the drugs for the controlled buys, there was no reasonable

15

basis to believe any drugs would be found at the Littlefield residence. (ECF No. 25, PageID.157.)

This is a bridge too far. By Willis' own admission, he traveled directly from the Littlefield residence on March 25, 2024, and engaged in a drug transaction. Whether the transaction was with his supplier or a customer, it connected the Littlefield residence to Willis' suspected drug dealing activity. Moreover, "[a]n issuing judge need not eliminate every alternative explanation to find a 'fair probability' that contraband will be present." *Sanders*, 106 F.4th at 467 (finding that the fact that Sanders sold drugs from his vehicle did not negate probable cause to search the apartment he drove to and from before and after the transactions); *see also United States v. Stearn*, 597 F.3d 540, 560 (3d Cir. 2010) (recognizing that "even if another location is an equally likely repository of evidence, a magistrate may infer probable cause to search" a residence based on circumstantial evidence establishing a "fair probability that contraband or evidence of a crime will be found in a particular place" (citation omitted)). "Given the evidence connecting [Willis'] drug trafficking with the [Littlefield residence], the [state] judge did not arbitrarily issue the search warrant." *Sanders*, 106 F.4th at 467.

Willis also offers an alternate explanation for his brief encounter with the two women in his vehicle after the second controlled buy. Recall that Willis traveled from the Citgo station to the Littlefield residence where he remained only seconds before leaving the residence and meeting very briefly with the women. Willis says that he met with the women to give one a pair of designer sneakers. (ECF No. 27,

16

PageID.150.) This does not, however, negate officer Tamer's belief that, in his training and experience, the activity he observed at the time was consistent with a drug transaction.

### 3.

Willis also challenges the affidavit for failing to indicate that, after the first controlled buy when Willis went to the Littlefield property, a black female also arrived and remained at the residence. (*Id.* at PageID.149.) It is unclear why Willis thinks this negates a finding of probable cause. In any event, the Court must "look holistically at what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit." *Christian*, 925 F.3d at 312. Stated differently, "the affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

And Tamer's affidavit stated that Willis traveled to and from the Littlefield residence both before and after engaging in known and suspected drug transactions, regardless of whether he or someone else owned or resided at the residence. "The critical element in a reasonable search is not that the owner of the property is suspected of a crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). The affidavit adequately demonstrated the "nexus between the place to be searched" (the Littlefield residence) and "the evidence sought" (proof of drug dealing). *Carpenter*, 360 F.3d at 594.

17

**4.**

Lastly, Willis contends that the warrant affidavit contained two knowing and reckless falsehoods that entitle him to a *Franks* hearing: that Tamer (1) misrepresented Willis' criminal history and (2) falsely stated that Littlefield was Willis' secondary residence. (ECF No. 27, PageID.154).

A defendant is entitled to a hearing on the truth of statements in a warrant affidavit if he makes "a substantial preliminary showing" that "the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or [made a] material omission in the affidavit" and that "the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017). Willis has failed to make this showing.

Start with the recitation in the search warrant affidavit of Willis' criminal history. Tamer wrote that Willis "has a criminal history for the following: Delivery/manufacture [of] controlled substance less than 50 grams, Breaking and entering, Criminal Sexual assault [in the] 1st degree, [P]ossession of a controlled substance less than 25 grams, [and] Conspiracy to deliver[]/manufacture controlled substance over 1,000 grams." (ECF No. 29-2, PageID.198.) The government acknowledges that while Willis was charged with these offenses, he was only convicted of the drug conspiracy charge. (ECF No. 29, PageID.183.)

"A law enforcement officer's statement is only considered to be issued with reckless disregard for the truth if a defendant shows that the affiant subjectively

18

entertained serious doubts as to the truth of his or her allegations." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019) (cleaned up). According to the government, "Tamer misread Willis's criminal history to include some offenses which were ultimately dismissed against Willis." (ECF No. 29, PageID.183.) This was, says the government, an inadvertent mistake. (*Id.*) Willis offers no counter. *See Young*, 847 F.3d at 348–49 (recognizing that a defendant must do more than make a bald allegation that an officer was intending to mislead the issuing judge). And even if he could, he still makes no showing that removing the offenses other than the drug conspiracy conviction would have materially affected the probable cause assessment; the issuing judge would still have considered all the other facts connecting Willis, the Littlefield residence, and drug trafficking activity. *See United States v. O'Neill*, 94 F.4th 531, 543 (6th Cir. 2024) ("Under the framework outlined in *Franks*, a court must excise a recklessly or deliberately false statement and determine whether the officer's affidavit would establish probable cause without it.").

The same is true for Willis' argument that the affidavit's reference to the Littlefield property as his secondary residence "was a false conclusory statement made intentionally and knowingly with reckless disregard for the truth." (ECF No. 27, PageID.154.) Willis says the affidavit "failed to establish with any degree of reliability or reasonable certainty" that he owned, leased, or occupied the residence. (*Id.* at PageID.150.) The Court has already found that Tamer's affidavit sufficiently connected Willis to the Littlefield residence, irrespective of any ownership or tenancy interest. Omitting this residency reference would not alter the probable cause finding.

In sum, Willis has failed to make a sufficient showing that the two challenged statements were deliberately or recklessly false or were material to the state judge's probable-cause finding. A *Franks* hearing is not warranted.

## IV.

For all these reasons, Willis' request for a *Franks* hearing and motion to suppress (ECF No. 27) are DENIED.

SO ORDERED.

Dated: December 26, 2024

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
